Lindsey Wagner, Esq. (CBN 309808)
Lindsey Wagner, Esq.
lwagner@scottwagnerlaw.com
**Scott Wagner and Associates, P.A.**
Jupiter Gardens
250 South Central Boulevard, Suite 104
Jupiter, FL 33458
Telephone: (561) 653-0008
Facsimile: (561) 653-0020
**California Office:**
3500 W. Olive Avenue, Suite 300
Burbank, CA 91505
Telephone: (213) 377-5200

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER PUPA,<br><br>               Plaintiff,<br>v.<br><br>BOOZ ALLEN HAMILTON, INC.<br><br>          Defendant.<br><br>_____/ | Case Number:<br><br>**COMPLAINT** |

Plaintiff JENNIFER PUPA brings this Complaint seeking damages and equitable relief against Defendant BOOZ ALLEN HAMILTON, INC., , for engaging in gender discrimination, in pay and promotions as well as retaliation in violation of both state and federal law. Plaintiff also brings claims for discrimination and retaliation under California law.

## **INTRODUCTION**

1. This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e,*et seq*., and Equal Pay Act, 29 U.S.C. § 206(d) to correct unlawful employment practices that discriminate on the basis of gender, to remedy retaliation and to provide appropriate relief to the Plaintiff, and other similarly situated female employees.

2. Plaintiff also brings this action under the California Fair Employment and Housing Act, California Government Code § 12940, *et seq*., California Equal Pay Act, California Labor Code § 1197.5, *et seq*., and California's Unfair Competition Law Business and Professions Code § 17200, *et seq*.

3. Plaintiff enjoyed a pristine career, until she uncovered invidious equal pay violations committed by Defendant: paying Plaintiff and other women tens of thousands of dollars less than her male counterparts.

4. Evidence of Defendant's animus towards women can be found in its practice of gender stereotyping and how it harassed and treated plaintiff while she was pregnant and breastfeeding.

5. After Plaintiff lodged multiple complaints regarding the gender discrimination she was suffering, Defendant denied her pay increases, denied her promotional opportunities and threatened her with losing her job.

6. Defendant Booz Allen has engaged in, and continues to engage in, unlawful gender discrimination by denying female employees equal pay and promotional opportunities.

## JURISDICTION AND VENUE

7.   Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* and the Equal Pay Act, 29 U.S.C. §206(d). This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f), 28 U.S.C. §§ 1331 and 1343(a)(4).

8.   Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 as the unlawful employment practices alleged in this Complaint were committed in this district.

9.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## CONDITIONS PRECEDENT

10.   All conditions precedent to this lawsuit, if any, have been satisfied or waived.

11.   Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

12.   On March 31, 2020, the EEOC mailed Plaintiff her Notice of Right to Sue. (**See Ex. A, Notice of Right to Sue, dated March 31, 2020**).

13.   Plaintiff files this Complaint within 90 days of receiving her Notice of Right to Sue.

## PARTIES

14.   Plaintiff Jennifer Pupa is a citizen of Los Angeles County, California.

15.   At all times material to this Complaint, Plaintiff was an "employee" as defined by state and federal laws.

16.   Defendant Booz Allen Hamilton, Inc. is headquartered in McLean, Virginia with over 80 offices around the world and over 25,000 employees.

17.   Defendant is registered to do business in the State of California and at all times material to this Complaint has conducted business in Los Angeles County, California.

18.   At all times material to this Complaint, Defendant was an "employer" as defined by Title VII.

19. Defendant may be served with process by delivering a copy of the summons and complaint to its registered agent.

## FACTUAL ALLEGATIONS

20.  Plaintiff Jennifer Pupa began working with Defendant Booz Allen Hamilton, Inc. (Booz Allen) in May 2011 as a Consultant / Business Systems Analyst. Defendant Booz Allen is a technology and management consulting firm with contracts including those with the Department of Defense and numerous Fortune 500 commercial entities.

21.  Ms. Pupa was discriminated against while working on the Defendant's clients including Southern California Edison (SCE) and Bristol-Myers Squibb (BMS).

22.  Ms. Pupa joined the Defendant's company with seven years of experience in business management and marketing analysis along with a Bachelor's in Economics.

23.  While studying for her Master's Degree in Cybersecurity Technology, she excelled at her position, earning promotions to Senior Consultant / Cyber Metrics Analyst in April 2012 and to Associate / Cyber Metrics Team Manager in January 2014.

24.  In July 2016, her manager at the time, Michael Waters, Principal / Director of the Enterprise Information Security team within the Enterprise Information Services department, promoted Ms. Pupa to the position of Lead Associate / Cyber Risk and Metrics Team Manager.

25.  Derrick Burton, Principal / Director of the Enterprise Operation Services team, and his supervisor, Kevin Winter, Vice President / Chief Information Officer of the Enterprise Information Services department, questioned Mr. Waters' decision to promote Ms. Pupa in 2016.

26.  Though each new promotion and subsequently gained skills and education raised her salary level, it never matched the position's market average range, nor equal level of her male colleagues in similar positions with similar job duties.

27.  To help alleviate the known pay inequality, Mr. Waters approved Market Salary Adjustments (MSAs) for Ms. Pupa every six months.

28.  MSAs are a tool used by human resources to review and increase salaries commiserate

with the market and to ensure employees are paid within an average pay band as compared to similarly situated peers both inside and outside the firm.

29.   However, despite the MSAs and continued stellar performance reviews, Ms. Pupa's salary still did not reach an equal level.

30.   While Mr. Waters supported equal pay between all coworkers, Mr. Burton and Mr. Winter did not agree.

31.   In March 2017, Ms. Pupa's coworker whom she had worked with since 2011, Raena Dhuy, submitted a complaint to the California Department of Fair Employment and Housing (DFEH) regarding unequal pay and discrimination.

32.   Ms. Dhuy worked on Mr. Burton's Enterprise Operations Services team and was a mentee of Mr. Waters. Prior to Ms. Dhuy's DFEH complaint, whenever she had been denied a request for equal pay by Mr. Burton, Mr. Waters utilized Booz Allen's anonymous complaint hotline to report the discrimination and failure to provide Ms. Dhuy with equal pay.

33.   Within months, and despite her exceptional performance achievements, Ms. Dhuy was given a "Lack of Work Order" by Mr. Burton informing her that "due to lack of work matching your skill set, we are terminating your employment with the firm." Ms. Dhuy was separated from her position, which prompted the DFEH complaint. The Defendant alleged this was because the company was cutting costs and reorganizing.

34.   Two months after Ms. Dhuy received her Right to Sue from the DFEH in March 2017, Defendant unexpectedly terminated Mr. Waters' employment as well.

35.   After Mr. Waters' dismissal, Defendant transferred Ms. Pupa without discussion to work under Mr. Burton's organization in the Enterprise Operation Services team.

36.   The transfer did not make sense as Ms. Pupa was the only Subject Matter Expert in Cybersecurity Metrics for the Department and her career progression would be better suited to stay in Cybersecurity instead of IT Operations.

37.   Despite the oddity of Defendant's mandated transfer, Ms. Pupa handled the change

without any slowdown in work productivity as explicitly described in her performance assessment that year.

38.   Ms. Pupa was due for a MSA in June and again in December 2017 but did not receive one; she routinely received MSAs while under the supervision of Mr. Waters.

39.   In late November 2017, Ms. Pupa reached out to immediate manager, Dianne Snell who reported directly to Mr. Burton (Dhuys' supervisor), to inform Ms. Snell about her pregnancy.

40.   The next month, Ms. Pupa completed her Master's degree in Cybersecurity Technology with a 4.0 GPA.

41.   In December 2017, Ms. Pupa received an excellent performance review from her manager, detailed goals for the following year, and multiple requests for cyber metrics tasks from Mr. Winter and Don Wells, the new Director of Enterprise Information Security (replacement for Mr. Waters). In the chain of command, Mr. Burton and Mr. Wells reported to Mr. Winter.

42.   On January 10, 2018, Mr. Burton scheduled a meeting with Ms. Pupa; she assumed the meeting would be to discuss a salary increase based on her receiving an excellent performance review and obtaining her Master's degree the month before.

43.   Instead, Mr. Burton gave her a "Lack of Work Order," informing her that "due to lack of work matching your skill set, we are terminating your employment with the firm." Similar to Ms. Dhuy's complaint, the Defendant again claimed this was because the company was cutting costs and reorganizing.

44.   This was in complete contrast to all the cybersecurity project requests and goals she had received just one month before – and before her pregnancy announcement.

45.   Once an employee is given a "Lack of Work Order," they are given only 30 days to find a new position within the company or face termination.

46.   Prior to the expiration of her 30-day deadline, Ms. Pupa was fortunate enough to find a new position as a Cybersecurity Solutions Engineer in the client-facing Commercial department (as opposed to the internal Enterprise Information Services department).

47.  However, in this new position, she also faced further discrimination, retaliation, and unequal pay.

48.  Prior to her transfer, under Mr. Burton, she received only a 1% increase to her salary instead of the average 10% she and her male coworkers had received in the past.

49.  She also knew that client-facing staff, who were disproportionately male, earned more money than the internal staff. As such, she sought a new MSA to bring her salary into line with her peers, job title and added client-facing responsibility.

50.  However, when she discussed the MSA upon her transfer with her mentor, former Principal Matthew Doan, he cautioned her to wait a few months in her new position.

51.  She knew that performance bonuses would be in July and January, so she waited until June 2018 to request her a MSA in her new department.

52.  On July 13, 2018, Ms. Pupa's Career Manager, former Principal Ryan Liu, told her that she would not receive a MSA or a bonus because HR Business Partner, Jennifer Carter, decided that she did not want to bring Ms. Pupa "to the attention" of Bill Phelps, the Executive Vice President of the Commercial Department, prior to her scheduled maternity leave later that month.

53.  Ms. Pupa was confused and disappointed as to why her upcoming maternity leave had anything to do with her performance to date or right to equal pay, but neither Liu nor Carter budged on their decision.

54.  Ms. Pupa returned from maternity leave on November 15, 2018.

55.  Upon her return, she was assigned to work under Project Manager and Senior Associate Craig Lobdell, who had a widespread reputation for creating hostile work environments.

56.  Mr. Lodbell and Mr. Liu initially approved Ms. Pupa for telework, coming to the worksite only once per week.

57.  But within a few weeks, Mr. Lobdell began repeatedly making disparaging comments to Ms. Pupa regarding family responsibility and breastfeeding and disregarded his previous approval for her telework schedule. When Ms. Pupa was on worksite, Mr. Lobdell often denied meeting

breaks and accommodations for her to pump breastmilk.

58.   On December 19, 2018, Mr. Liu informed Ms. Pupa that she was on track to receive an overdue MSA and salary increase of $20,000, bringing her salary to $130,000.

59.   However, Ms. Pupa's new salary was still approximately $50,000 under the current market value of her job position.

60.   Mr. Liu told Ms. Pupa that he would continue to try to increase her salary to get it closer to the proper rate.

61.   Mr. Liu later confided to Ms. Pupa that he felt "icky" giving her the news of her salary increase because he had recently hired a new male Lead Associate, with less experience and education than Ms. Pupa, with a starting salary of $175,000.

62.   Defendant failed to pay Ms. Pupa her performance bonus in either June 2018 or December 2018.

63.   As the weeks went by, the hostile work environment grew worse, this time, coming from Ms. Pupa's team members, as well.

64.   For example, her co-worker, Ron Darnell, told Ms. Pupa that if he had been in charge of hiring and knew she would need accommodations due to breastfeeding, that he would not have hired her.

65.   Another teammate, Irene Kwon, stated in a team meeting that the company needed to hire more people who do not have families and could be on site every week; Mr. Lobdell openly agreed with Ms. Kwon.

66.   On January 15, 2019, Ms. Pupa met with Mr. Lobdell and Mr. Liu to complain about the continuing hostile work environment that she was subjected to, including her co-workers' comments.

67.   Instead of addressing her concerns, Mr. Lobdell simply asked how long her breastfeeding accommodations would last because it was not fair to the rest of the team.

68.   Mr. Liu acknowledged that the comments were sexist but did nothing to address her

complaints.

69.   After this meeting, Ms. Pupa became more ostracized from the team. Mr. Lobdell began to withhold information, resources, and meeting invitations from Ms. Pupa, effectively crippling her ability to perform her job responsibilities.

70.   On January 18, 2019, Ms. Pupa reached out to Commercial Vice President Sherri Farrell to escalate her discrimination complaints. Ms. Farrell asked for an email detailing the discriminatory actions and Ms. Pupa complied.

71.   A few days later, Ms. Farrell responded that she would contact the firm's HR Business Partner, Ms. Carter, to address the situation and that she would keep Ms. Pupa updated.

72.   Ms. Pupa never heard anything back from Ms. Farrell after this.

73.   On January 28, 2019, Ms. Pupa met with Mr. Doan to discuss a potential new project; during the meeting she shared the discriminatory acts and environment she was suffering. Mr. Doan suggested that she join a different team that was located in New Jersey; however, the cross-country travel would be a hardship to her health and familial needs.

74.   In early February 2019, Ms. Pupa met the new Solutions Integration Lead of the current team, Principal Jamey Dillon, and shared her complaints about Mr. Lobdell and her co-workers; Mr. Dillon promised to take an active role in addressing her concerns. The Solutions Integration Lead position is a managerial position; Mr. Lobdell reported to Mr. Dillon within the contract.

75.   A few days later, Mr. Dillon and Mr. Liu asked Ms. Pupa if she would consider replacing Mr. Lobdell as the Project Manager; however, this would require her to work with the same team and did not address any of her complaints of gender discrimination. Pupa was concerned that she would have to stay in a hostile environment.

76.   In her role as Project lead, Ms. Pupa was responsible for identifying and interviewing new candidates and handled the Monthly Project Management Report, which required using the Monthly SAR report that contained potential staff, their experience and pay rates.

77.   As she was considering transferring from the toxic environment under Mr. Lobdell, she

began searching for her and Mr. Lobdell's replacement as Project Manager.

78.   In reviewing the SAR report, Ms. Pupa found potential candidates, but also learned that a male candidate with less experience than her was earning approximately $50,000 more per year than her. While there was one female with similar pay to the male candidate and nearly identical experience to Pupa, she did not have children.

79.   After finding the less qualified male candidate who was paid significantly more than her, Ms. Pupa identified at least a dozen other men with similar or less experience who were paid significantly more than herself.

80.   Ms. Pupa was also responsible for interviewing and hiring a male to fill an open Associate level position at a salary of $20,000 more than her newly adjusted salary. If she had selected the Project Manager position, she would have supervised this male colleague.

81.   Defendant told Ms. Pupa that if she did not accept the New Jersey position, the only other qualified candidate was Ms. Dahlia Mihyar, and whichever position Ms. Pupa chose, Ms. Mihyar would be her backfill for the other position. Ms. Mihyar was paid $50,000 more despite having nearly identical resumes; the only difference was that Ms. Pupa was a working mother with family responsibilities and a disability. Ms. Pupa had worked for the Defendant for eight years; Ms. Mihyar had worked for the Defendant for less than one year.

82.   Ms. Pupa reached out to Mr. Dillon and Mr. Liu about the pay discrepancies and wanted to know if it would be resolved if she accepted the Project Manager position.

83.   Mr. Dillon informed Ms. Pupa that he spoke with Ms. Farrell and she agreed that Pupa was underpaid, but she was not happy that Pupa utilized the information from the SAR report to complain about the pay discrepancy, despite company policy permitting her to do so.

84.   In March 2019, Ms. Pupa finally received a Market Salary Review by HR. confirming she was well below the market average minimum.

85.   Booz Allen's Human Resources agreed that she was underpaid and that to correct her salary to the market average, it would need to be increased to a minimum of $160,000.

86.  In mid-March, Ms. Pupa received an email from Mr. Liu stating that she would receive an immediate MSA increase to $143,000 as well as a confirmation of another MSA to $163,000 in June of 2019.

87.  He stated that she would also be receiving an immediate retention bonus of $10,000 and be eligible for a performance bonus in June 2019.

88.  Ms. Pupa inquired if the MSA only considered those in her Cyber Engineer Job Family or all Commercial Lead Associates; Mr. Liu stated the MSA was conducted with all Lead Associates across all markets, not just her Job Family and not just Commercial department.

89.  But, as confirmed by Principal Katie Wilks, MSAs were supposed to be conducted within a job family and within a market, not across titles or sectors as that would lower the average.

90.  Within Ms. Pupa's Cyber Engineering Job Family, the average salary was between $170,000-180,000 at that time.

91.  After receiving information regarding the promised pay increases to bring Ms. Pupa in-line with her co-workers' salaries, she signed the retention letter and officially agreed to transition to the new team in New Jersey as a Cyber Metrics Lead.

92.  However, one week later, Mr. Liu told her that Bill Phelps, in consultation with Mr. Markose and Ms. Farrell, rescinded her new compensation plan and that there was no other plan in place at that time.

93.  Ms. Pupa was trapped working for Defendant for an additional 18 months or else she would be forced to return her retention bonus – which she only signed on the promise of correcting her deficient salary.

94.  On April 4, 2019, Ms. Pupa ran into Mr. Markose who asked her to schedule a call with him the next week to discuss her complaints about gender discrimination.

95.  She spoke with Markose on April 18, 2019 and shared details regarding her salary discrepancy, discriminatory comments, and hostile work environment she had experienced. She shared that she had raised her complaints to seven senior leadership members to date, none of

which had yet to report it to HR for investigation per company policy. He promised resolution of her complaints.

96.   Finally, on May 28, 2019, Mr. Markose and Ms. Carter informed her that she would receive the initially proposed salary increase to $143,000; however, there would be no further increases until January 2020. When she asked about the second increase, she was told that there would not be another increase until the following January.

97.   Neither Markose nor Carter addressed Ms. Pupa's hostile work environment complaints simply stating they were not prepared to discuss those issues.

98.   Mr. Markose told Ms. Pupa multiple times that she should be focusing on her overall career growth and her pending promotion to Senior Associate at the end of the year instead of her salary increases. When she stated that she was uncomfortable with this outcome and was considering escalating her complaint to the Ethics and Compliance department, Mr. Markose again warned of her pending promotion.

99.   Due to the unsatisfactory May 28th meeting, Ms. Pupa filed a report with the Ethics and Compliance department in June 2019.

100. Meanwhile, she continued to excel at her job while working remotely 75% of the time.

101. Her new Project Manager, Senior Associate Pranav Saha, told her the client considered Ms. Pupa to be the subject matter expert, even more so than the staff who was on site full time.

102. The stress and anxiety of the ongoing discrimination, retaliation, and unresolved complaints caused debilitating Post-Traumatic Stress Disorder and a flareup of her thyroid autoimmune condition, which was previously in remission. On September 10, 2019, her doctor put her out on medical leave.

103. On October 31, 2019, after the Ethics and Compliance (E&C) Department announced that its alleged investigation revealed that, "no policy violations were substantiated."

104. Ms. Pupa questioned the alleged investigation, but was told her case was closed and nothing further was needed from her.

105. The E&C Department refused to give her a written finding of its investigation.

106. Ms. Pupa later learned that E&C did not interview many of the key witnesses listed in her complaint.

107. On December 18, 2019, Mr. Liu told Ms. Pupa that her salary would be increased to $167,000, effective January 1, 2020, but Mr. Markose denied her promotion to Senior Associate. While she was given notice of the increase, she did not receive any of it since she was on medical leave.

108. On April 1, 2020, Ms. Pupa was reassigned without warning. This included a title change from Cybersecurity Solutions Engineer to Change Management Consultant, effectively demoting her position and diminishing her average salary by once again realigning her skillset to a non-cybersecurity related job title.

**<u>Booz Allen's Pay and Promotion Structure</u>**

109. Booz Allen's senior leadership is predominantly male. There were no female Principals or Officers in the Enterprise Information Services department under CIO Kevin Winter during the 2012-2018 time frame. There was only one female VP, Ms. Farrell, in the Commercial department under EVP Bill Phelps.

110. It was a well-known practice throughout Booz Allen that women were compensated less than comparable, or less qualified, males.

111. In 2018, Booz Allen utilized a "nine-box system" to rank performance against potential.

112. The process involved career managers coming together in the commercial department to discuss the way they manage careers and where employees should be rated. They would estimate a preliminary idea of where each employee should be based on their skills, guidelines, criterion.

113. But, there never was a direct correlation that because an employee got into a box on the system, they should or must be promoted or see an increase in compensation.

114. Instead, promotional opportunities were based mainly on subjective factors, such as opinions of lower level managers, not objective factors.

115. Historically, Booz Allen employees would complete formal, written annual self-assessments.

116. The self- assessments were not done solely by each employee, but with input from other employees as well. The company called it a "360 degree" approach to the self-assessment.

117. These self-assessments would be considered in making decisions regarding pay increases and promotions.

118. However, in 2018, the review system was changed to an informal monthly "snapshot" discussion between an associate and her manager.

119. The monthly snapshot discussions were entirely verbal and not documented.

120. As such, beginning in 2018, Booz Allen failed to adequately document feedback and performance for employees.

121. The experience of Ms. Pupa is not unique and in fact the Defendant has a pattern and practice of paying female less than men in similarly situated position. In fact, the Defendant has created a culture dominated by male leadership where females are grossly underpaid.

## COUNT I: GENDER DISCRIMINATION

### Title VII, 42 U.S.C. § 2000e

122. Plaintiff re-alleges the allegations contained in paragraphs 1 - 121.

123. As described above, Defendant's actions in subjecting Plaintiff to different terms and conditions of employment constitutes unlawful discrimination on the basis of gender in violation of Title VII, 42 U.S.C. § 2000e.

124. The effect of the conduct was to deprive Plaintiff of economic opportunities and otherwise adversely affected Plaintiff's status as an employee because of her gender.

125. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered injuries for which she is entitled to recover both equitable and compensatory damages, including but not limited to, back pay, front pay or reinstatement, compensatory damages, attorney's fees and costs of litigation.

126. Defendant willfully and wantonly disregarded Plaintiff's rights and the unlawful acts taken against Plaintiff were undertaken in bad faith.

127. Defendant has a pattern and practice of paying female less than men in similarly situated position. In fact, the Defendant has created a culture dominated by male leadership where females are grossly underpaid.

128. Plaintiff further seeks punitive damages for the Defendant's disregard of her federally protected rights.

## COUNT II: RETALIATION

### TITLE VII, 42 U.S.C. § 2000e

### (As to Plaintiff Pupa)

129. Plaintiff re-alleges the allegations contained in paragraphs 1 -121.

130. As described above, Plaintiff engaged in protected activity in that she objected to and complained about gender discrimination.

131.  After Plaintiff complained about the disparate and harassing treatment she was suffering in the workplace, Defendant subjected Plaintiff to adverse employment actions in violation of Title VII, 42 U.S.C. § 2000e.

132. The adverse actions are causally connected to her protected conduct.

133. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered injuries for which she is entitled to recover both equitable and compensatory damages, including but not limited to, back pay, front pay or reinstatement, compensatory damages, attorney's fees and costs of litigation.

134. Defendant willfully and wantonly disregarded Plaintiff's rights and the unlawful acts taken against Plaintiff were undertaken in bad faith.7

135. Defendant has a pattern and practice of paying female less than men in similarly situated position. In fact, the Defendant has created a culture dominated by male leadership where females are grossly underpaid.

136. Plaintiff further seeks punitive damages for the Defendant's disregard of her federally protected rights.

## COUNT III: DISCRIMINATORY WAGES

### Equal Pay Act, 29 U.S.C. § 206(d)

137. Plaintiff re-alleges the allegations contained in paragraphs 1 - 121.

138. As described above, Defendant paid Plaintiff less earnings that comparable male employees, depriving Plaintiff of equal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

139. Defendant willfully paid Plaintiff lower salary and bonuses than male employees performing substantially similar work.

As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered injuries for which she is entitled to recover actual and liquidated damages, attorney's fees and costs of litigation.

## COUNT IV: RETALIATION

### Equal Pay Act, 29 U.S.C. § 206(d)

140. Plaintiff re-alleges the allegations contained in paragraphs 1 - 121.

141. As described above, Plaintiff engaged in protected activity in that she complaint about disparity in the wages she received as compared to male employees, depriving Plaintiff of equal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

142. After Plaintiff complained about the disparate and harassing treatment she was suffering in the workplace, Defendant subjected Plaintiff to adverse employment actions in violation of Title VII, 42 U.S.C. § 2000e.

143. The adverse actions are causally connected to her protected conduct.

144. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered injuries for which she is entitled to recover both equitable and compensatory damages, including but not limited to, back pay, front pay or reinstatement, compensatory damages, attorney's fees and costs of litigation.

145. Defendant willfully and wantonly disregarded Plaintiff's rights and the unlawful acts taken against Plaintiff were undertaken in bad faith.

146. Defendant has a pattern and practice of paying female less than men in similarly situated position. In fact, the Defendant has created a culture dominated by male leadership where females are grossly underpaid.

147. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff suffered injuries for which she is entitled to recover actual and liquidated damages, compensatory damages, attorney's fees and costs of litigation.

**COUNT V: DISCRIMINATORY WAGES**

**VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

GENDER DISCRIMINATION California Government Code § 12940, et seq.

148. Plaintiff re-alleges the allegations contained in paragraphs 1 - 121.

149. Defendant discriminated against Plaintiff in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940, et seq., by subjecting her to uniform employment policies, procedures and practices that result in disparate impact based on gender and by subjecting her to disparate pay, discriminatory denial of pay raise, disparate terms and conditions of employment, discriminatory job assignment, discriminatory demotions, discriminatory denial of promotions, and other forms of discrimination in violated of FEHA.

150. Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

151. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Pupa entitling her to punitive damages.

152. Defendant's policies, procedures and practices have produced a disparate impact on Plaintiff with respect to the terms and conditions of her employment.

153. As a result of Defendant's conduct, Plaintiff has suffered and continue to suffer harm,

including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as non-economic damages.

154. By reason of Defendant's discrimination, is entitled to all legal and equitable remedies available for violations of FEHA, including reinstatement and an award of compensatory and punitive damages.

155. Plaintiff seeks attorneys' fees under Cal. Gov. Code § 12940 and California Code of Civil Procedure § 1021.5.

**COUNT VI:**

**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT**

**California Labor Code § 1197.5, et seq.**

156. Plaintiff re-alleges the allegations contained in paragraphs 1 - 121.

157. Defendant has discriminated against Plaintiff in violation of California Labor Code § 1197.5, et seq.

158. Defendant has discriminated against Plaintiff by discriminating against her as compared against similarly-situated male attorney employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

159. Defendant subjected Plaintiff to discriminatory pay, discriminatory denials of raises, discriminatory denials of promotions and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the California Equal Pay Act. 147.

160. Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the California Equal Pay Act.

161. Defendant willfully violated the California Equal Pay Act by intentionally, knowingly, and deliberately paying women less than men.

162. As a result of Defendant's conduct and/or Defendant's willful, knowing and intentional

discrimination, Plaintiff has suffered and will continue to suffer harm, including but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

163. Plaintiff seeks  all legal and equitable remedies, including liquidated damages.

164. Plaintiff is  also entitled to civil penalties pursuant to California Labor Code §§ 1197.5 and 2699(f).

165. Plaintiff seeks attorneys' fees under California Labor Code § 1197.5 and California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

a.      Assume jurisdiction over this action;

b.      Award judgment against Defendant and for the Plaintiff;

c.      Award Plaintiff back pay, liquidated damages and front pay;

d.      Award Plaintiff compensatory damages for pain and suffering, mental and emotional distress, anxiety, humiliation, and any other injury in an amount to be determined by the enlightened conscious of the jury;

e.      Award Plaintiff punitive damages against Defendant in an amount to be determined by the enlightened conscious of the jury to deter Defendant and others from similar misconduct in the future;

f.      Award injunctive relief;

g.      Award Plaintiff reasonable attorney's fees, expenses and costs of litigation;

h.      Award Plaintiff pre and post-judgment interest;

i.      Award Plaintiff such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated this 29th day of June 2020.

*Complaint*
*Scott Wagner and Associates, P.A.*
Page **19** of **20**

1    Respectfully submitted,

2                                              s/ Lindsey Wagner
                                               Lindsey Wagner, Esq.
3                                              California Bar No. 309808
                                               Lindsey Wagner, Esq.
4                                              lwagner@scottwagnerlaw.com
5                                              **Scott Wagner and Associates, P.A.**
                                               **Main Office:**
6                                                 Jupiter Gardens
                                                  250 South Central Boulevard, Suite 104
7                                                 Jupiter, FL 33458
                                                  Telephone: (561) 653-0008
8                                                 Facsimile: (561) 653-0020
                                               **California Office:**
9                                                 3500 W. Olive Avenue, Suite 300
                                                  Burbank, CA 91505
10                                                Telephone: (213)377-5200
                                                  Facsimile: (561) 653-0020
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28